

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

### AP-75,320

### RODOLFO ALVAREZ MEDRANO, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL
### FROM CAUSE NO. CR-0942-03-F IN THE 332ND DISTRICT COURT
### HIDALGO COUNTY

JOHNSON, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, HOLCOMB, and COCHRAN, JJ., joined. KELLER, P.J., and KEASLER and HERVEY, JJ., concurred.

### O P I N I O N

In August 2005, appellant was convicted of a capital murder committed by numerous co-defendants. TEX. PENAL CODE §§ 19.03(a)(7). The charge was based on appellant's alleged participation in a conspiracy to commit an armed robbery that resulted in the deaths of six persons. *See* TEX. PENAL CODE § 7.02(b). Based on the jury's answers to the special issues set forth in Texas

Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071, § 2(g).[1]  Direct appeal to this Court is mandatory. Art. 37.071, § 2(h).  We have reviewed appellant's thirty-four points of error.  We affirm the judgment of the trial court.

STATEMENT OF FACTS

The evidence at the guilt phase showed that Rosie Gutierrez lived with her sons, Ray Hidalgo and Jerry Eugene Hidalgo, at 2915 East Monte Cristo Road in Edinburg.  There were two houses on the property, hereinafter referred to as the "west-side house" and the "east-side house."  Rosie testified that she and her sons played dominoes in the kitchen of the west-side house on the evening of Saturday, January 4, 2003.  At about 12:20 a.m., Ray went to the east-side house with his friend, Juan Delgado, Jr.  Shortly thereafter, Rosie and Jerry went into the living room, where she watched television and Jerry talked on the phone with a friend.  She heard loud noises that sounded like fireworks and then heard a loud banging on her door.  Four or five men "barged into the house" wearing jackets with the word "Police" on them.  All but one of the men were wearing ski masks. The unmasked man used a telephone cord to tie her up, and a masked man with a big gun demanded money, gold, drugs, and jewelry.  Jerry responded that they did not have anything.  The masked man hit Jerry repeatedly with his gun, ordered that he be tied up in the kitchen with electrical cords, and yanked off a chain that Jerry was wearing.  "The man" took off one of Jerry's tennis shoes, asked if anyone wanted it, then dropped it.  He then said, "Let's go," and the intruders left.  He came back into the house and ransacked the living room, left, came back inside again, fatally shot Jerry, and left again.  After he left the last time, Rosie untied herself and called 9-1-1.

---

[1]  Unless otherwise indicated, all references to articles and sections (§) refer to the Texas Code of Criminal Procedure and the Texas Penal Code, respectively.

Shortly after 1:00 a.m., police were dispatched to the scene in reference to "a pseudo cop robbery." They found Jerry's body lying on the floor in the kitchen of the west-side house. He had sustained gunshot wounds to his back. His hands and legs were bound with extension cords, and he had a tattoo that indicated he was a member of the Texas Chicano Brothers gang. Police also found spent 7.62x39mm caliber casings on the floor.

In the living room of the west-side house, drawers were on the floor, and tables were turned over. A mattress had been left standing upright in one of the bedrooms. Edinburg police officer Ramiro Ruiz testified that it looked like someone had gone through the residence looking for something.

Police found the body of Juan Delgado, III, lying face down in the grass outside the east-side house. There was a live 9-mm round in the grass near his body. Inside the east-side house, police found the bodies of Juan Delgado, Jr. and Jimmy Almendarez in the front room and the bodies of Ray and Ruben Castillo in another room. All had sustained fatal gunshot wounds.

Ballistics evidence in the east-side house included spent 7.62x39mm caliber casings and live 7.62x39mm caliber and 9mm rounds. The house had been ransacked, and there was broken sheet rock in one of the rooms. Some of the victims' pants pockets had been pulled out.

An area behind the houses was covered with tall grass and concrete rubble. In this area, police found a "beanie cap" that belonged to one of the co-conspirators, a cell phone and charger that belonged to Ruben Castillo, and some letters and photographs that belonged to Rosie, Jerry, and Ray.

A car parked at the scene belonged to Luis Villa. Police found Villa at a motel in Edinburg on January 7. Villa reported that he was present at the time of the murders and that he had escaped the east-side house by jumping out a window. He was not charged in connection with the offense.

On January 13, police received an anonymous tip that led them to investigate Guadalupe Bocanegra, a member of the Tri-City Bombers gang. Guadalupe, who was not present at the scene of the murders, gave police information that led them to more suspects. Guadalupe's brother Marcial Bocanegra ("Marshall") was arrested on January 15, followed by appellant ("Kreeper"), Humberto Garza ("Gallo"), Robert Gene Garza ("Bones"), and Juan Cordova ("Juanon") on January 24. Later, the police arrested Juan Ramirez ("Ram"), Jorge Espinoza Martinez ("Choche"), Robert Cantu ("Robbie"), Salvador Solis ("Little Sal"), Reymundo Sauceda ("Kito), and Jeffrey Juarez ("Dragon").[2]

David Valdez, an identification technician with the Edinburg Police Department, testified about the search of appellant's residence and truck. Appellant lived in a second-story apartment and his in-laws lived in the main house on the property. Items that were seized from inside appellant's apartment included books about guns and police radio frequencies, a walkie talkie, a scanner, money inside a video case, other money wrapped in rubber bands, and appellant's laptop computer and wallet. Appellant's wallet contained lists of names and numbers that Officer Valdez opined "might [refer] to the commissary fund for certain inmates." It also contained a list of police-scanner frequency codes for Edinburg and the surrounding cities. Inside the residence of appellant's in-laws, police found a computer tower that contained a loaded gun and more lists of names and numbers similar to the ones in appellant's wallet. Inside appellant's pickup truck, police found money in an envelope addressed to the Texas Department of Criminal Justice (TDCJ) Inmate Trust Fund, more money in the center console, deposit slips and money orders for the TDCJ Inmate Trust Fund, and

---

[2] Other co-conspirators named in the charge were Ricardo Martinez ("Rica") and Juan Miguel Nunez ("Perro"). Officer Ramiro Ruiz testified that there were active warrants for these two individuals.

four walkie talkies in a black bag inside the truck toolbox.

A forensic examiner at the Department of Public Safety Crime Laboratory (DPS crime lab) in Austin searched various computer items found at appellant's residence for evidence of gang activity or homicide. After performing a keyword search on multiple hard drives, CDs, and diskettes, he recovered a letter and "to do list" that contained gang nicknames. The letter was apparently written by appellant to a jail inmate and the "to do list" apparently referred to getting a list of gang members who were in the same section at the county jail.

Miguel Angel Tinajero, appellant's childhood friend, testified that appellant came to his house sometime after the murders and asked him "to hold something for him." Appellant gave him a rectangular case and left. Tinajero looked inside the case and saw that it contained two or three rifles. The next day, Tinajero put the case in the trunk of a car at his father's residence near Elsa. When he opened the trunk, he saw that other weapons had already been placed there. Tinajero testified that appellant knew where the keys to the vehicle were kept. Police searched the trunk of the vehicle and found ammunition, several firearms, and two gun cases. Latent prints on both gun cases matched appellant's fingerprints. One of the firearms found in the trunk, a burgundy SKS, had a blood stain on its muzzle that was consistent with the DNA profile of victim Juan Delgado, Jr.

One of the gun cases (state's Exhibit 103) contained three guns: a black SKS Norinco 7.62x39mm rifle (state's Exhibit 107); a second black SKS Norinco 7.62x39mm rifle (state's Exhibit 108); and, a green SKS Norinco 7.62x39mm rifle (state's Exhibit 109).[3] A forensic firearms and toolmarks examiner at the DPS crime lab in Austin analyzed the ballistics evidence. He determined that State's Exhibit 108 had fired a bullet recovered from the body of Ruben Castillo,

---

[3] An SKS is an imported semi-automatic rifle of Chinese origin.

four bullets recovered from the body of Jerry Hidalgo, and many of the other bullets, casings, and bullet fragments found at the scene. He further determined that State's Exhibit 107 had fired a bullet casing that was found in the east-side house.

On January 25, appellant gave an audio-taped statement to Detective Reyes Ramirez of the Edinburg Police Department. Appellant admitted that he was member of the Tri-City Bombers ("Bombitas"). He stated that he and Juanon were sergeants in the gang and that Gallo was a captain. He stated that Gallo called him on a Saturday and said that he needed some weapons. Appellant was to transport the guns to Juanon's house.

> I got a call saying that they needed the weapons. I told him I needed somebody to pick them up because me and my wife were going to go out and I already had made plans. And he said he would send somebody over . . . and it got later. It was about 8:00 and nobody got there, so I told him I could take them to Juanon's house. I took them to Juanon's house and just dropped them off there in one of . . . their bedrooms.[4]

After he dropped off the weapons, appellant called Gallo and reported that the weapons were already at Juanon's house and that he was on his way to McAllen. Appellant went out with his wife that night, returning home about 12:30 a.m., and they stayed up late watching movies. The next morning, another gang member called him.

> Joe Lee Gonzales [called] asking me if I had heard what had happened. I told him I didn't. So he tells me that–never mind, that we would talk about it later. And that's when I knew something bad had happened.

That evening, appellant saw the news, and "I knew what happened, you know, that they had killed six guys." Appellant said that he thought that they were just going to steal some marijuana, "some

---

[4] Appellant stated that the co-conspirators were not present when he delivered the guns, but Juanon's wife was there. Appellant stated, "She just unlocked the door and went to her bedroom. I went . . . into one of the other bedrooms and just left [the guns] there and then I just left."

pounds." When Detective Ramirez asked him how many pounds, he said he thought it was about 500. He added, "When they first called me, they asked me if I wanted to go and I told them no because, I mean, I've never done something like that. I don't do that, you know."

Appellant further stated that about 2:00 p.m. on Sunday, Juanon called him and said that he did not want the guns at his house anymore. Appellant and his wife were in Harlingen at the mall, so he sent his friend Gilbert Gonzalez to retrieve the guns. Gilbert Gonzalez dropped off the guns on appellant's porch. When appellant returned home at about 7:00 or 8:00 p.m., he cleaned the guns, although "they weren't even dirty" because "they probably had already cleaned them." He said there were three rifles, that they were SKS 7.62x39mms, and that two of them were black and one was green. Appellant explained that he had bought the guns at a gun show in early 2000 for about $300 each; he acknowledged that the sale was done under the table and that he had not registered the weapons.

Appellant stated that he kept the weapons until police arrested Marcial Bocanegra and "everything came out in the news." Appellant then called Tinajero and ordered him to come over to his house and pick up the three guns in the case. Appellant told Tinajero to destroy the guns if appellant was ever arrested.

Appellant explained that "[s]ome girl named Melissa . . . started everything." She had gone to the house on Monte Christo, had seen a large amount of marijuana, and told a man named Robert. Melissa and Robert then told Choche. Detective Ramirez asked appellant who had given the order to go ahead and steal the marijuana. Appellant replied, "Gallo." Appellant explained that Gallo gets orders from Jeffrey Juarez, a "major" in the gang who lives in Sugarland, but that Gallo would not necessarily have had to get permission from Juarez to give an order. Appellant said that Bones was

a "shooter," that Gallo was driving around with Juanon, that he thought Choche was in another vehicle, and that others at the scene included Ricardo, Marcial Bocanegra, Kito, Perro, Sal, and Juan Ramirez. Detective Ramirez questioned him further.

> Q.    That was a rip off, right? In other words, they got the information
> . . . from Melissa and Robert and they got together and they decided to go and hit these guys and rip them off of their drugs, right?
>
> A.    Yeah.
>
> Q.    That's how it's supposed to have happened?
>
> A.    That's how it was supposed to happen.
>
> Q.    Nobody was supposed to have gotten shot. Okay. But something went wrong and people started shooting, right?
>
> A.    Yes, sir.

When Detective Ramirez asked appellant who would profit from this endeavor, appellant said, "I guess everybody involved was going to get something."[5] He explained that they generally put a percentage into the treasury and that he was the treasurer.

Detective Ramirez asked appellant what went wrong, and appellant said the Bombitas had found letters indicating the victims could be members of the Texas Chicano Brothers ("Chicanos"), enemies of the Bombitas, so they decided to kill them. He thought that the co-conspirators later burned the letters or threw them away.

Detective Ramirez also asked appellant what he knew about the "shootings in Donna."[6]

---

[5] Detective Ramirez asked appellant if he had the money hidden somewhere, and appellant said no because "nothing happened."

[6] The "shootings in Donna" occurred on September 4, 2002, when some members of the Tri-City Bombers murdered four women who were waitresses at a bar in Donna, Texas. *See Garza v. State,* 213 S.W.3d 338 (Tex. Crim. App. 2007).

Appellant said, "It was a hit gone bad." Appellant explained that Carlos Rodriguez, a jailed "lieutenant" in the Tri-City Bombers, had ordered a hit on a bar owner in Donna because she was the main witness in an attempted-murder case against him. Rodriguez ordered the hit from the county jail. Bones, Snoop, and Ricardo carried it out, but they "were all messed up" and killed the waitresses "by mistake." Appellant stated, "We were all upset because [Carlos Rodriguez] just jumped the gun, you know, without even consulting with Gallo." He explained that "everything gets messed up" when there is no chain of command.

Detective Robert Alvarez of the Edinburg Police Department testified that the Tri-City Bombers and the Texas Chicano Brothers were rival gangs. He confirmed that appellant and the co-conspirators Bombitas and that victims Ray and Jerry Eugene Hidalgo were Chicanos. He testified that the two gangs had a "green light," which is a standing order to "represent" the gang every time they see each other. He explained that the green light gives gang members authority, without asking permission, to "do whatever is necessary" to represent their gang, including murder. He stated that this particular green light has existed for years and that anyone in the gang would be aware of any green light against any other gang.

At the punishment phase, the state introduced appellant's statement to Investigator Juan Sifuentes of the Hidalgo County Sheriff's Department, in which appellant explained his gang involvement and his knowledge of the Donna shootings in more detail. Appellant explained that he had become friends with gang members in high school and that he officially became an active member of the Bombitas in 1999. He explained that active membership involved staying in constant contact with members who are in prison as well as members who are not in prison, attending mandatory meetings, and obeying every order handed down by the higher-ranking members. He

stated that Carlos Rodriguez (Roach) was arrested for shooting a man who was related to a rival gang member named Coco, at Garcia's Bar. The rival gang responded by shooting at Roach's house, and Roach retaliated in the same fashion when he was out on bond. Roach told appellant beforehand that he was going to "take care of business," and appellant understood that to mean that Roach was going to shoot them.

Appellant explained that Roach turned himself in after retaliating against the rival gang. While Roach was in the Hidalgo County Jail awaiting trial, he ordered the Bombitas to kill Coco and "a female witness," but appellant explained, "We saw no reason to kill these people if Roach was going to plead out." Roach then acted on his own to have the bar owner killed, enlisting the help of Bones, Snoop, Ricardo, Lupio, and Chito.[7] Appellant stated that Bones, Snoop, and Ricardo followed the wrong car home and killed the wrong people. Ricardo wanted to call the killings off because it was the wrong car, but Bones and Snoop said that they were true members and that the job was going to be done one way or another.

Appellant stated that he called Lupio after the Donna shootings and asked him about the weapons. Lupio told him that appellant's weapons were used in the shootings, but that they "were in good hands," and that he would return them to appellant as soon as possible. Appellant stated that two or three weeks passed and Lupio failed to return the weapons, so he went and got them. He picked up a Tec-9 from "Smiley's" apartment in McAllen and picked up two SKS rifles later because they were in Mission, Texas.[8]

---

[7] "Chito" was also referred to in the record as "Chico."

[8] In his statement, appellant said, "I love weapons and by this time I was purchasing weapons and gang members were starting to ask me for weapons. By this time also, my weapons or other weapons that I would purchase and would loan them out. Another thing I did with my weapons is to place them in different cities in the Valley for easy access and the weapon of choice was the SKS 7.62x39mm."

Appellant explained, "Roach did not follow the chain of command and no one knew that these killings were going to be carried out." Appellant stated that he got his "sergeant stripes" at a mandatory gang meeting in September 2002 at which "it was mentioned that the killings in Donna had been carried out and that there were no links to us." Humberto Garza (El Gallito) told everyone that "this job was for Roach."

Investigator Sifuentes testified that some of appellant's weapons, which included the guns used in the Donna killings and other guns and ammunition, were later recovered from the residence of appellant's grandmother.

### GUILT PHASE POINTS OF ERROR

In points of error eight through twelve, appellant complains that the trial court improperly overruled his objection to the indictment for failing to plead the law of parties. He contends that this violated his rights to notice, due process, and equal protection under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 10, of the Texas Constitution. He asserts that this omission violated his right to a jury determination of his case under the Sixth Amendment and his right to jury unanimity under Article 36.29 of the Texas Code of Criminal Procedure and Article V, Section 13 of the Texas Constitution. He also cites *Apprendi v. New Jersey,* 530 U.S. 466 (2000), and *Ring v. Arizona,* 536 U.S. 584 (2002), in support of his argument.

It is well settled that the law of parties need not be pled in the indictment. *Sorto v. State,* 173 S.W.3d 469, 476 (Tex. Crim. App. 2005), *cert. denied,* 126 S. Ct. 2982 (2006); *Marable v. State,* 85 S.W.3d 287, 287 (Tex. Crim. App. 2002). We decline to overrule our established precedent. Points of error eight through twelve are overruled.

**Sufficiency of the Evidence**

Appellant argues points one through three together.  In point of error one, he asserts that the evidence is legally and factually insufficient to support his conviction for capital murder.[9]  In point of error two, he alleges that the evidence is insufficient to support a conviction for capital murder because there was no evidence to support a nexus between a theft and the murders.  In point of error three, he contends that the evidence at trial was legally insufficient to establish his specific intent to kill.

In evaluating the legal sufficiency of the evidence, we view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *See Jackson v. Virginia,* 443 U.S. 307, 319 (1979).  Legally sufficient evidence can still be factually insufficient if it is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or whether, considering conflicting evidence, the jury's verdict, although legally sufficient, is nevertheless against the great weight and preponderance of the evidence.  *Watson v. State,* 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).  A factual sufficiency review is "barely distinguishable" from a *Jackson v. Virginia* legal-sufficiency review.  *Marshall v. State,* 210 S.W.3d 618, 625 (Tex. Crim. App. 2006), *cert. denied,* 128 S. Ct. 87 (2007).  The difference is that the legal-sufficiency standard requires the reviewing court to defer to the jury's credibility and weight determinations, while the factual-sufficiency standard permits the reviewing court to substitute its judgment for the jury's on these questions "albeit to a very limited

---

[9]  The state points out in its brief that appellant does not develop any argument challenging the factual sufficiency of the evidence.  Appellant raises factual insufficiency in the heading of his first point of error, but does not set out separate argument or authority in support of his factual-insufficiency claim.  In the body of his brief, he discusses only the legal-sufficiency standard.  Although the factual-insufficiency claim could be categorized as inadequately briefed, we will consider this argument in the interest of justice.  *See* TEX. R. APP. P. 38.1(h).

degree." *Id.*

Appellant was indicted for the murder of more than one person during the same criminal transaction. TEX. PENAL CODE § 19.03(a)(7)(A). The indictment stated that appellant "intentionally and knowingly cause[d] the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by shooting them with a firearm, and said murders were committed during the same criminal transaction." The charge authorized the jury to convict appellant as a party or a conspirator. TEX. PENAL CODE §§ 7.02(a) and 7.02(b). When the charge authorizes the jury to convict on several different theories, the verdict of guilty will be upheld if the evidence is sufficient on any one of the theories. *Rabbani v. State,* 847 S.W.2d 555, 558-59 (Tex. Crim. App. 1992).

The charge stated: "A person commits capital murder when such person murders more than one person during the same criminal transaction." It also explained party liability.

> All persons are parties to an offense who are guilty of acting together in the commission of an offense. A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.

> A person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense.

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, then all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. Capital Murder, Murder, Robbery, and Attempted Robbery are felonies.

> By the term "conspiracy," as used in these instructions, is meant an agreement between two or more persons, with intent that a felony be committed, that they, or

one or more of them, engage in conduct that would constitute the offense. An agreement constituting a conspiracy may be inferred from acts of the parties[.]

The conspiracy portion of the application paragraph stated:

Now, if you find from the evidence beyond a reasonable doubt that RODOLFO ALVAREZ MEDRANO, the defendant, and ROBERT GENE GARZA a/k/a "BONES", HUMBERTO GARZA a/k/a "GALLO", MARCIAL BOCANEGRA a/k/a "MARSHALL", JUAN RAMIREZ a/k/a "RAM" a/k/a "LENNY", JUAN CORDOVA a/k/a "JUANON", SALVADOR SOLIS, a/k/a "LITTLE SAL", RICARDO MARTINEZ a/k/a "RICA" or "RICK", JUAN MIGUEL NUNEZ a/k/a "PERRO", REYMUNDO SAUCEDA a/k/a "KITO", JEFFREY JUAREZ a/k/a "Dragon", JORGE ESPINOZA MARTINEZ, a/k/a "CHOCHE", or ROBERT CANTU a/k/a "ROBBIE", hereinafter referred to as CO-CONSPIRATORS, entered into a conspiracy to rob the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, and that pursuant there to did carry out, or attempt to carry out, such a conspiracy to rob the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, in that on or about JANUARY 5, 2003, in Hidalgo County, Texas, in the course of committing theft of personal property from the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, to wit, money, jewelry, drugs, a cell phone, or personal papers, and with intent to obtain or maintain control of said property, the CO-CONSPIRATORS intentionally caused bodily injury, to wit: death by shooting the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO in the same criminal transaction, with a firearm or firearms and that the defendant, RODOLFO ALVAREZ MEDRANO, pursuant to said conspiracy, if any, with the intent to promote or assist ROBERT GENE GARZA a/k/a "BONES", HUMBERTO GARZA a/k/a "GALLO", MARCIAL BOCANEGRA a/k/a "MARSHALL", JUAN RAMIREZ a/k/a "RAM" a/k/a "LENNY", JUAN CORDOVA a/k/a "JUANON", SALVADOR SOLIS, a/k/a "LITTLE SAL", RICARDO MARTINEZ a/k/a "RICA" or "RICK", JUAN MIGUEL NUNEZ a/k/a "PERRO", REYMUNDO SAUCEDA a/k/a "KITO", JORGE ESPINOZA MARTINEZ, a/k/a "CHOCHE", or ROBERT CANTU a/k/a "ROBBIE" in the commission of said robbery, if any, was acting with or aiding one or more of the said CO-CONSPIRATORS in the execution or attempted execution of said robbery, if any, and that the murders of the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO by one or more of the said CO-CONSPIRATORS, if there was such, was done in furtherance of the conspiracy to rob the said JIMMY ALMENDAREZ, JUAN DELGADO, III, JERRY EUGENE HIDALGO, JUAN

DELGADO, JR., RUBEN CASTILLO, and RAY HIDALGO, if any, and was an offense that should have been anticipated as a result of the carrying out of the conspiracy, then you will find the defendant, RODOLFO ALVAREZ MEDRANO, guilty of Capital Murder.

Appellant argues that he was not present at the scene, that the state failed to show any affirmative link between Appellant and the actual murders themselves, that the state did not attach any modicum of intent on the part of Appellant specifically to commit murder, and that there was no evidence regarding Appellant having a meeting of the minds with any of the shooters such that would make Appellant a party to the robbery or murders.

Because he was convicted under theory of party liability, the state did not have to prove that appellant specifically intended to kill the victims. When Gallo, a captain in the gang, called him and told him that "they needed the weapons" and that appellant was to transport them to Juanon's house, appellant did as he was told. He admitted this in his statement, and his fingerprints were found on a gun case that contained firearms that were linked to the murders. After the murders, he had the guns returned to his home, cleaned them, then left them with a friend with instructions to destroy them in the event that he was arrested.

Appellant said in his statement that he thought that "they were just going to rob some marijuana, some pounds," and that "when they first called me, they asked me if I wanted to go and I told them no because, I mean, I've never done something like that. I don't do that, you know." Thus, it appears from appellant's statement that Gallo told him about the planned robbery when they discussed dropping off the guns. This evidence at least supports an inference of an agreement constituting a conspiracy.

Appellant next alleges that this was a killing and unrelated taking of property and that there

was no nexus between the murder and the theft. He argues that the murders occurred because the shooters discovered, while at the residence of the victims, that the victims were members of a rival gang. In order to prove murder committed in the course of robbery under § 19.03(a)(2), the state must prove a nexus between murder and theft such that the murder occurred in order to facilitate the taking of the property. *Moody v. State,* 827 S.W.2d 875, 892 (Tex. Crim. App. 1992); *Ibanez v. State,* 749 S.W.2d 804, 807 (Tex. Crim. App. 1986). But appellant was not convicted of murder in the course of robbery. He was instead charged with and convicted of murdering more than one person during the same criminal transaction under § 19.03(a)(7)(A). Therefore, the nexus requirement is inapplicable to the instant case.

As stated in the charge, the state was required to prove that the murders were "done in furtherance of the conspiracy to rob" and "should have been anticipated as a result of the carrying out of the conspiracy." *See* § 7.02(b). Appellant admitted in his statement that he knew that the co-conspirators were arming themselves with his weapons and that they were planning to take a large amount of drugs. He admitted that he was a gang officer and that he knew some of his fellow gang members had committed murder in the past.[10] This evidence, viewed in the light most favorable to the jury's verdict, could lead a rational trier of fact to conclude that the murders were committed in furtherance of the unlawful purpose and should have been anticipated as a result of the carrying out of the conspiracy.

In his statement, appellant also said that he later heard that the co-conspirators had decided to kill the victims because they found letters indicating that the victims could be members of the

---

[10] Appellant stated that Ricardo and Bones carried out the Donna hit. Ricardo Martinez and Robert Gene Garza (Bones) were alleged to be co-conspirators in appellant's case. Appellant clarified in his statement that "Ricardo" was the same person involved in the instant case.

Texas Chicano Brotherhood. However, the jury, as the finder of fact, was free to believe or disbelieve any portion of appellant's statement.[11] *See Margraves v. State,* 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Even considering the conflicting evidence in appellant's statement, the jury's verdict is not against the great weight and preponderance of the evidence. Further, the evidence is not so weak that the jury's verdict seems clearly wrong and manifestly unjust. The evidence is both legally and factually sufficient to support appellant's conviction for capital murder. Points of error one through three are overruled.

## The Law of Conspiracy

In points of error four through seven, appellant contends that his constitutional rights were violated by the application of the law of conspiracy under § 7.02(b). He specifically claims that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment and that his rights to equal protection and due process were violated.[12] He complains that § 7.02(b) dilutes the State's burden of proof and allows a capital murder conviction without a specific finding of intent to commit the murders, or intent to kill even as a party to the murder.[13]

---

[11] We note that appellant's story that the co-defendants decided to kill the victims only because they found letters indicating that the victims "could be Chicanos" does not necessarily coincide with Rosie Gutierrez's testimony and the evidence found at the crime scene. Gutierrez testified that she heard noises that sounded like fireworks before the men entered the west-side house. Police found the body of Delgado, III, lying face down in the grass outside the east-side house and, as they entered the east-side house, the bodies of Delgado, Jr. and Almendarez in the front room. This evidence could lead a rational trier of fact to conclude that the co-defendants started shooting as they approached and before they entered either house.

[12] At trial, appellant did not object to the charge on this basis. Appellant instead objected on the basis of his Fifth Amendment right to notice and Sixth Amendment effective assistance of counsel, and that there was no evidence that he had any knowledge of a conspiracy to commit robbery. *See Ladd v. State,* 3 S.W.3d 547, 564 (Tex. Crim. App. 1999) (overruling appellant's constitutional challenges to a jury-charge instruction on the law of parties because the constitutional arguments had not been raised in the trial court).

[13] Appellant asserts that he was convicted as a party to the alleged underlying conspiracy to commit robbery. However, the conspiracy portion of the application paragraph required the jury to find that appellant and the co-conspirators entered into a conspiracy to rob the victims. As the state explains in its brief, appellant fails to recognize that he was not prosecuted and convicted as a party to the robbery, but rather was tried and convicted as a

"A defendant may be convicted of capital murder under § 7.02(b) without having the intent or actual anticipation that a human life would be taken that is required for an affirmative answer to the anti-parties issue." *Valle v. State,* 109 S.W.3d 500, 503-04 (Tex. Crim. App. 2003). Section 7.02(b) does not, however, lack a *mens rea* requirement. *Cienfuegos v. State,* 113 S.W.3d 481, 493 (Tex. App.–Houston [1st Dist] 2003, pet. ref'd); *Gravis v. State,* 982 S.W.2d 933, 938 (Tex. App.–Austin 1998, pet. ref'd). It provides that

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

TEX. PENAL CODE § 7.02(b). Thus, the mental state required for the underlying felony supplies the *mens rea* for the felony actually committed by the co-conspirator. *Cienfuegos,* 113 S.W.3d at 493-494; *Gravis,* 982 S.W.2d at 938. Section 7.02(b) is not facially unconstitutional. *Id.* Nor is it unconstitutional as applied to appellant. The evidence was sufficient to show that appellant entered into a conspiracy to commit robbery, that the victims were killed in furtherance of the robbery for which he provided the weapons, and that appellant should have anticipated the murders as a result of that robbery. Points of error four through seven are overruled.

### Charge Error–Conspiracy

In point of error twenty-five, appellant complains that the charge allowed the jury to use one theory of party liability (aiding and abetting) to make appellant a party to the conspiracy to commit robbery, and then use another separate and distinct theory of parties culpability (should have anticipated) to make him responsible for the acts of the co-defendants. He alleges that the erroneous

---

participant in the conspiracy involved in this case.

charge violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. He further contends in point of error twenty-six that the evidence was legally insufficient to convict him of capital murder under the law of parties, except to the extent that the jury might have been misled by the charge into believing that a person who assists a conspiracy in the way appellant did can be regarded as a co-conspirator himself.

Appellant argues that the conspiracy application paragraph improperly authorized the jury to convict him as a party to the conspiracy because it alleged that he had the intent to promote or assist the co-conspirators and that he was acting with or aiding them in the commission of the offense. *See* § 7.02(a). However, this is not all that was required. The conspiracy application paragraph required the jury to find that appellant and the co-conspirators entered into a conspiracy to rob the victims. It further required the jury to find that the murders were done in furtherance of the conspiracy to rob the victims and should have been anticipated as a result of the conspiracy. The abstract portion of the charge also defined conspiracy liability in accordance with § 7.02(b). The evidence was sufficient to support appellant's conviction for capital murder under the conspiracy theory of liability as set out in the charge. Points of error twenty-five and twenty-six are overruled.

**The Donna Killings**

In points of error thirteen through nineteen, appellant claims that the trial court improperly admitted appellant's statements about the murders of four women in Donna, Texas (the Donna Killings), and Alvarez's testimony about appellant's gang membership. Appellant argues these seven points together. He asserts violations of the First, Fifth, Sixth, and Fourteenth Amendments. He also complains that the evidence was hearsay and that its admission violated his rights to confrontation and cross-examination. Although these particular claims are set out in the headings

for his points of error, none of them are developed with factual and legal argument in the body of his brief. Because the only arguments that appellant develops in his brief are those pertaining to Rules 403 and 404(b) of the Texas Rules of Evidence, we will address only those arguments. The rest of appellant's claims on this issue are inadequately briefed. TEX. R. APP. P. 38.1(h).

In point of error thirty, appellant challenges the admission of testimony about the Donna killings, alleging violations of Rules 403 and 404(b) and the Fifth, Sixth, Eighth, and Fourteenth Amendments. The only claims that he supports with factual and legal authority are the ones pertaining to Rules 403 and 404(b). Again, we decline to address his constitutional claims because they are inadequately briefed. TEX. R. APP. P. 38.1(h).

Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith, but it may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. TEX. R. EVID. 404(b); *Montgomery v. State,* 810 S.W.2d 372, 387-88 (Tex. Crim. App. 1991) (opinion on rehearing). Even if the evidence is admissible under Rule 404(b), it may still be excluded under Rule 403 if the trial court determines that its probative value is substantially outweighed by the danger of unfair prejudice. *Montgomery,* 810 S.W.2d at 387. Unfair prejudice occurs when the evidence has an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one. *Vasquez v. State,* 67 S.W.3d 229, 240 (Tex. Crim. App. 2002). The admissibility of evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion. *Sorto,* 173 S.W.3d at 491.

### Detective Ramirez

Appellant complains of Detective Ramirez's testimony about the Donna killings. In his

statement to Detective Ramirez, appellant acknowledged that he knew about the shootings in Donna, which he described as "a hit gone bad." He explained that a jailed Tri-City Bombers "lieutenant" ordered the hit on a bar owner in Donna who was the main witness against him in an attempted-murder case, but the gang members who carried out the hit "messed up" and killed the wrong people.

In order to convict appellant of capital murder under the conspiracy theory of party liability, the state had to prove that appellant "should have anticipated" the murders as a result of carrying out the conspiracy. TEX. PENAL CODE § 7.02(b). Appellant said he knew that some members of the Tri-City Bombers murdered a group of women in Donna just four months before this offense. The state used its knowledge of the prior offense to argue that appellant should have known or should have anticipated that his fellow gang members were willing to commit murder. *Cf. Sorto,* 173 S.W.3d at 491 (Sorto's observation of co-defendant murdering a prior victim following kidnapping and sexual assault proved that Sorto knew co-defendant might be likely to kill instant victims under similar circumstances). Thus, the state offered the evidence to prove knowledge, not character conformity. The evidence was admissible for this purpose under Rule 404(b).

The trial court did not abuse its discretion in admitting some evidence of the Donna killings to show that appellant should have anticipated the murders in the instant case. Some portions of appellant's statement to Detective Ramirez were redacted, including appellant's knowledge of the Tri-City Bombers' involvement in another robbery and murder "at a trailer park" and his references to whether or not there was a "hit" on an FBI agent. The state also sought to admit another statement that appellant had made to Investigator Juan Sifuentes of the Hidalgo County Sheriff's Office, in which he described the Donna killings and his involvement with the Tri-City Bombers in even more detail, but the trial court sustained appellant's objections to that statement and excluded it at the guilt

phase.

Appellant did not implicate himself in the Donna killings, he admitted only knowledge of the incident. Evidence that appellant knew about the Donna killings was highly probative of whether he should have anticipated the instant murders as a result of his fellow gang members carrying out their conspiracy to commit robbery. Appellant made other, more prejudicial, statements that showed that he should have anticipated the murders, but they were kept out of evidence in the guilt phase through the redaction of his statement to Ramirez and the exclusion of his statement to Sifuentes. Any danger of unfair prejudice stemming from appellant's statement to Detective Ramirez did not substantially outweigh the probative value of the evidence. The admission of this evidence did not violate Rule 403.

**Detective Alvarez**

Appellant also challenges to the testimony of Detective Alvarez, the state's gang expert. Alvarez described the Tri-City Bombers as a "criminal street gang" as defined in the Penal Code. *See* TEX. PENAL CODE § 71.01(d). He explained how the gang began and how it evolved until it split into two rival gangs, the Tri-City Bombers (Bombitas) and the Texas Chicano Brothers (Chicanos). He testified that the Bombitas use a loose military chain of command, that the gang is a business that collects money through illegal activities, and that the members continuously or regularly associate in the commission of criminal activities. He also testified that the Bombitas and the Chicanos have a "green light," which is a standing order to do whatever is necessary to "represent" the gang every time they see each other." He testified that the green light as to the Chicanos has existed for years and that anyone in the gang would be aware of any green light against any other gang. Using factors such as tattoos, association, and self proclamation, he identified appellant and his co-conspirators

as Bombitas and victims Jerry and Ray Hidalgo as Chicanos.

Alvarez's testimony served to explain the relationship between the rival gangs and the green light that existed between them. By the time Alvarez testified, the jury had already heard appellant's own statements that he was a ranking member of the gang who acted as treasurer and provided the weapons, and that he knew beforehand about the co-conspirators' plan to steal a large quantity of drugs. Alvarez's testimony provided further corroboration and explanation of appellant's statements in the context of gang rivalries and protocol. The probative value of Alvarez's testimony was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. TEX. R. EVID. 403; *see also Gallo v. State,* 239 S.W.3d 757, 762 (Tex. Crim. App. 2007)(Rule 403 carries a presumption that relevant evidence will be more probative than prejudicial). Points of error thirteen through nineteen and thirty are overruled.

**Notice Under Rule 702**

In point of error twenty, appellant asserts that Alvarez's gang testimony should have been excluded because the state did not timely provide the defense with the qualifications of this witness as an expert in the area of gang membership and gang identification. Appellant contends that, as a result, he was not afforded proper notice that this witness would testify as an expert.

On May 20, 2003, defense counsel filed a "Motion for Discovery, Production and Rule 702 Hearing" that requested, in part, that the state provide to the defense, at least thirty days prior to trial, the name, address and curriculum vita of each witness the state intends to qualify as an expert. During a pre-trial hearing on July 22, 2003, defense counsel stated that he already had a list of their witnesses, but asked to be provided with the qualifications or any kind of expert witness so that he

could prepare to contest the experts' credentials." The state responded that it needed to request that information, and the trial court told the state, "You need to put in the request today."

Over a year later, the trial court signed a written order dictating, in part, that the state provide "the name, address and curriculum vita" of its intended expert witnesses to defense counsel no later than July 29, 2004.[14] Nearly a year after that, on July 27, 2005, the state filed its "Notice to Defendant of Possible Expert Witnesses for the State," which included Alvarez's name and address. During a pre-trial hearing on July 28, 2005, the following exchange occurred.

> [PROSECUTOR]: And today I did give him the statement of qualifications for each of our possible witnesses. There are some that we still need to get to him, maybe two or three. So as far as that's concerned, I think that was his main objective for today's hearing, and I've provided that.
>
> We did, on Monday, Judge, file our notice or our motion to have him list his expert witnesses if he intends to use any, and we have yet to receive those. But it's my understanding that he was going to look over ours, and based on what we gave him, he was going to decide on who, if any, expert witnesses he was going to use and he would give that to us before next Thursday if I am correct.
>
> [DEFENSE COUNSEL]: That is correct, Your Honor. But I would like the Court to notice that we are not waiving any of my client's rights pursuant to a definite ruling on our motion for discovery production and Rule 702, a hearing in which the Court ordered back, I believe, sometime last year that they give us that information 30 days from your ruling.
>
> And that never happened until yesterday. I am going to have to look at–at– at some law on that. And I–that's why we–we are asking for the next pretrial, Judge, to see whether or not we are going [to] be requesting sanctions.
>
> The next thing, Judge, if you also rule on our motion–if that's okay with the Court.
>
> THE COURT: I am–I am not agreeing to grant you sanctions, but I am agreeing that I'll give you a hearing–

---

[14] Before that time, Alvarez's name had appeared on all four of the State's lists of witnesses filed between May 6, 2003 and October 24, 2003. Each list indicated that he was a member of the Edinburg Police Department.

[DEFENSE COUNSEL]: I understand that, Judge.

THE COURT:  –on your request.

The guilt phase of trial began on August 15, 2005.  On Tuesday, August 23, 2005, the trial court held a Rule 702 hearing outside the presence of the jury on the admissibility of Alvarez's testimony.  Defense counsel objected at the hearing that the state provided "a vita of this alleged supposed expert . . . last Friday," and thus was not in compliance with the trial court's order to provide the information at least thirty days prior to trial.  The state responded.

> [PROSECUTOR]: Judge, we provided them copies of all of the curriculum vitaes that we had.  I did–he was supposed to come in last week and I had it–I gave them a copy.  It was my understanding they had that, Judge, and I gave them a copy last week because they saw me with it and apparently they didn't.  It may have been an oversight, Your Honor, but they were provided a copy of that.

Defense counsel argued that he had been given the information "approximately four days ago" and that did not give him "the opportunity to investigate this particular individual."  The following exchange ensued.

> [PROSECUTOR]: Your Honor, he's testified in three prior trials in this county, two of those cases involving this exact same murder that we are talking about, Your Honor.  We think his transcripts of his testimony have been offered and have been available.  They may have even been requested by the defense.
>
> THE COURT: We are talking about notice.  I mean, was he on a witness list?
>
> [PROSECUTOR]: Yes, Your Honor, and that's what I was going to get at. They were provided with a copy of our expert list and he was listed as that.  What we are talking about is just the CV, the curriculum vitae, the resume.
>
> [DEFENSE COUNSEL]: Again, Judge, you ordered it to be provided to us 30 days ago or 30 days before trial.  They did not comply with the Court order.  They provided it to us four days ago.
>
> THE COURT: The CV?  The CV, the curriculum vitae?

[DEFENSE COUNSEL]: Yes.

THE COURT: But he was on the witness list?

[DEFENSE COUNSEL]: He was on an–the witness list that was also provided to us last week.

[PROSECUTOR]: No, Your Honor, I–that's on file with the Court and they were provided a copy way before last week.

[DEFENSE COUNSEL]: We would still object, Your Honor.

THE COURT: That objection is overruled.

The trial court ordered the state to provide the name, address and curriculum vita of its intended expert witnesses to defense counsel no later than July 29, 2004. The state filed its "Notice to Defendant of Possible Expert Witnesses for the State" on July 27, 2005, and Alvarez's name and address appeared on that document. *See* Art. 39.14(b).[15] According to the parties' comments at the Rule 702 hearing, the state did not provide defense counsel with Alvarez's curriculum vitae until August 19, 2005. These facts demonstrate that the state only partially complied with the trial court's order in a timely fashion, supplying only the intended expert's name. However, appellant does not contend that the state acted in bad faith, nor is there any indication in the record that the state did so. *See Wood v. State,* 18 S.W.3d 642, 649-650 (Tex. Crim. App. 2000); *Martinez v. State,* 867 S.W.2d 30, 39 (Tex. Crim. App. 1993). It also appears that appellant could have reasonably anticipated

---

[15]  Article 39.14(b):

On motion of a party and on notice to the other parties, the court in which an action is pending may order one or more of the other parties to disclose to the party making the motion the name and address of each person the other party may use at trial to present evidence under Rules 702, 703, and 705, Texas Rules of Evidence. The court shall specify in the order the time and manner in which the other party must make the disclosure to the moving party, but in specifying the time in which the other party shall make disclosure the court shall require the other party to make the disclosure not later than the 20th day before the date the trial begins.

Alvarez's testimony, given that Alvarez's name appeared on the State's notice of possible expert witnesses approximately three weeks prior to trial and that he had previously testified in the trials of two co-conspirators. *See id.* The trial court did not abuse its discretion in permitting Alvarez to testify. Point of error twenty is overruled.

## Officer Ruiz

In points of error twenty-one through twenty-four, appellant challenges the admission of Officer Ramiro Ruiz's testimony about his investigation of this offense and an exhibit that accompanied his testimony. Appellant alleges that this evidence was inadmissible hearsay and that it violated his confrontation rights under the Sixth and Fourteenth Amendments to the United States Constitution.

On direct examination by the state, Ruiz testified that he had received an anonymous tip that led him to investigate Guadalupe Bocanegra, that he found weapons while searching Guadalupe's home and arrested him for being a felon in possession of a firearm, and that Guadalupe provided him with information following his arrest. Guadalupe acknowledged that he was a member of the Tri-City Bombers, but denied being present during the commission of this offense. He took Ruiz to the residences of fellow gang members, including Humberto Garza ("Gallo") and appellant ("Kreeper"). When asked if he learned during the course of his investigation whether "Gallo" and "Kreeper" were involved in the murders, Ruiz replied, "Yes." When asked if he was able to gather information as to whether appellant had guns at his residence, he replied, "Yes." When asked who had seen the weapons, he answered, "Guadalupe Bocanegra." At this point, defense counsel objected, outside the presence of the jury, to "this entire line of questioning." Defense counsel argued that the state was eliciting back-door hearsay that violated appellant's confrontation rights. The state responded.

[PROSECUTOR]: Judge, he was–he was part–he was the lead investigator–one of the lead investigators. He has knowledge as to what actions were taken with regards to the defendant and I'll tie that up. Because he certainly was there when the arrest warrant was executed as well as the search warrant, so these are all actions that he took based on his investigation.

THE COURT: Well, actions that he took at the time is fine, but you are leaving the impression–without actually getting to the words that Bocanegra has said, you are–you are–the implication is that he is fingering this gentleman right here.

Now, what actions were taken and what you did, that's fine. I have no problem with that. But you've got to be careful how you phrase the questions. Okay?

Now, if you have an objection, that objection is sustained.

Just be careful how you phrase the questions to this witness.

[PROSECUTOR]: Yes, Your Honor.

Defense counsel then asked the trial court to strike that portion of the testimony, or to instruct the jury to disregard that portion of the testimony, and requested a mistrial. The trial court denied these requests.

The prosecutor next asked Ruiz, "Where is it that your investigation led you to?" Ruiz responded, "It led me to the identification of . . . individuals that were involved in the shooting." The prosecutor questioned Ruiz about Marcial Bocanegra, Guadalupe's brother. The prosecutor asked, "And how is it that you came to know who Marcial Bocanegra was?" Ruiz responded, "Because he was another individual that Guadalupe named as being involved." At that point, defense counsel objected to Ruiz's testimony. *See* Tex. R. App. P. 33.1. Before defense counsel could specify the grounds for the objection, the trial court sustained it and instructed the jury to disregard the testimony. The trial court, however, denied defense counsel's request for a mistrial.

The prosecutor then asked Ruiz, "And why is it that you were looking for Marcial

Bocanegra?" Ruiz replied, "I learned that he was involved in the shooting." The prosecutor asked if there were further arrests after Marcial gave his statement, and Ruiz replied in the affirmative. When the prosecutor asked who was arrested, defense counsel objected again.

> [DEFENSE COUNSEL]: My objection is that we are listening to backdoor hearsay, what somebody–that somebody else basically told him without the right to confront and cross-examine the witness.

> THE COURT: Do you have a response?

> \*　　　　　\*　　　　　\*

> [PROSECUTOR]: –he is not testifying as to what somebody else told him. He is testifying as to what he did in the investigation.

> THE COURT: Again, be careful how you phrase your questions. The objection is overruled for the time being.

The prosecutor then asked Ruiz who else was arrested and if they gave statements. The prosecutor asked, "Now, once these statements were given, where is it that that led you to?" Defense counsel objected again on hearsay and confrontation grounds, and the trial court again overruled the objections. Ruiz responded, "To the identity and issuance of other arrest warrants for other individuals that were involved in the shootings."

When Ruiz continued testifying the next day, the prosecutor asked him who had been arrested in this case. Ruiz created an exhibit by writing down the names of each of the thirteen people arrested (including appellant), the dates of their arrests, and whether or not they gave a statement, which he indicated with the letter "S." After he finished making the list, the prosecutor asked how many of the 13 people listed belonged to a gang known as the Tri City Bombers. Defense counsel objected on the grounds of "backdoor hearsay" and *Crawford v. Washington,* 541 U.S. 36 (2004). The trial court overruled the objections. Ruiz testified that all of the people listed were

members of the Tri-City Bombers. The state offered the list, labeled State's Exhibit 101, into evidence, and the trial court asked defense counsel if he had any objections. Defense counsel responded, "I would base myself on the prior objection, Your Honor, as far as it being admissible." The trial court overruled the objection and admitted the exhibit into evidence. The prosecutor then continued questioning Ruiz.

Q. Now, Detective, did you learn whether or not the defendant was present at 2915 East Monte Cristo when the murders occurred?

A. Yes, I learned whether he was or was not present, yes.

Q. Okay. Was he?

A. No.

Q. Did you learn during the course of your investigation where it is that those weapons that were used in the murders came from?

A. Yes.

Q. Okay. Who supplied those weapons?

[DEFENSE COUNSEL]: Your Honor, I am going to object based on the Sixth Amendment, effective assistance of counsel, as well as right of confrontation and cross-examination. This is all based on hearsay, Judge.

THE COURT: The objection is overruled.

A. I learned that the weapons came from Rodolfo Medrano.

Hearsay is a statement, other than the one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). An out-of-court statement need not be directly quoted in order to run afoul of the hearsay rules. *Head v. State,* 4 S.W.3d 258, 261 (Tex. Crim. App. 1999), *citing Schaffer v. State,* 777 S.W.2d 111, 114 (Tex. Crim. App. 1999). When there is an inescapable conclusion that a piece of evidence is being offered to

prove statements made outside the courtroom, a party may not circumvent the hearsay prohibition through artful questioning designed to elicit hearsay indirectly. *Id.* Whether the disputed testimony violates the hearsay prohibition depends on how strongly the content of the out-of-court statement can be inferred from the context. *Id.* The question is whether the strength of the inference produces an inescapable conclusion that the evidence is being offered to prove the substance of an out-of-court statement. *Id.* at 262.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee criminal defendants the right to be confronted with the witnesses against him. Even when hearsay evidence is admissible under evidentiary rules, it may violate the Confrontation Clause if the defendant is not afforded the opportunity to confront the out-of-court declarant. *Shuffield v. State,* 189 S.W.3d 782, 790 (Tex. Crim. App.), *cert. denied,* 127 S. Ct. 664 (2006). Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation. *Crawford v. Washington,* 541 U.S. 36, 68 (2004). The United States Supreme Court declined to spell out a comprehensive definition of "testimonial" in *Crawford,* but it stated that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.*

The trial court did not err in admitting Ruiz's general testimony regarding who was arrested on what dates and if they gave statements, or State's Exhibit 101, which merely illustrated these basic facts. The co-conspirators' statements were not offered into evidence. Although the content of the co-conspirators' statements could arguably be inferred from the context, appellant failed to timely object to much of Ruiz's testimony. *See* TEX. R. APP. P. 33.1.

Appellant, however, did timely object when the prosecutor asked, "Now, out of these 13

people that you've listed during the course of your investigation, did you determine whether or not they all belonged to a gang known as the Tri City Bombers?" Ruiz answered that question in the affirmative. Appellant also timely objected when the prosecutor asked, "Who supplied the weapons?" Ruiz responded, "I learned that the weapons came from Rodolfo Medrano." Although Ruiz did not specifically state who told him these facts and what exactly was said, the strong inference is that Guadalupe Bocanegra or one of the other co-conspirators told Ruiz that appellant was a gang member and that he supplied the weapons that were used in the commission of the offense. If these statements were made by a co-defendant in response to police interrogation, then this was testimonial hearsay, and appellant was unable to confront and cross-examine the out-of-court declarant at trial. Assuming that the trial court erred in overruling appellant's objections to these particular questions, we hold that appellant was not harmed by the error.

Appellant fully acknowledged in his own statement that he was a ranking member of the Tri-City Bombers, that he dropped off the weapons at Juanon's house as requested by Gallo, and that after the offense he cleaned them and left them with Tinajero with instructions to destroy them if he was ever arrested. There was also other physical and testimonial evidence that connected appellant to the gang and the guns. We conclude beyond a reasonable doubt that the error, if any, did not contribute to appellant's conviction. TEX. R. APP. P. 44.2(a). Points of error twenty-one through twenty-four are overruled.

### Appellant's Audio-taped Statement

In points of error thirty-one, thirty-two, and thirty-three, appellant challenges the admission of his statement to Detective Reyes Ramirez. He asserts that his statement was involuntary and was taken in violation of the Fifth Amendment and Article 38.22, § 3(b).

At the suppression hearing, Ramirez testified that appellant was arrested on January 24 and that he asked to speak to Ramirez on the morning of January 25. Defense counsel questioned Ramirez on voir dire about whether appellant had previously invoked his right to counsel.

Q. Mr. Ramirez, are you aware of the fact that my client had been approached by a Texas Ranger concerning giving this statement prior to speaking to you?

A. I learned that after the fact, sir.

Q. So you knew, at one time or another, that my client had refused to speak to any law enforcement officer prior to you having him sign this waiver?

A. That is correct, sir.

Q. And you had that knowledge when you finally convinced him to sign the waiver; is that correct?

A. That is correct, sir. Yes.

Q. All right. So initially my client said, no, I don't want to talk to law enforcement, didn't he?

A. Yes, sir.

Q. And initially my client requested an attorney, didn't he?

A. Yes, sir.

Q. And yet you proceeded to take my client's statement, didn't you?

A. At his request, sir.

\* \* \*

Q. When you say at his request, it's your word versus his; is that correct?

A. Yes, sir.

Q. Did you record that, that he requested to talk to you personally?

A. No, sir, that wasn't recorded.

Ramirez further acknowledged that he knew appellant had been approached by FBI agents before he interviewed him, but he did not know if appellant had requested an attorney or had agreed to speak to them. Defense counsel did not call any Texas Rangers or FBI agents to testify regarding appellant's invocation of his right to counsel.

Ramirez testified that he recorded appellant's statement on a micro-cassette tape. The state offered a copy of the tape into evidence at the suppression hearing. Ramirez testified that he had reviewed the copy and had observed it to be the same as the original. When defense counsel asked Ramirez about the original, he stated, "It was submitted into evidence. I do not know who has it at this point." He further explained that he did not know who might be in possession of the tape at the time of trial because he had not been employed at the Edinburg Police Department since July 31, 2004.

At the beginning of the audio-taped statement,[16] Ramirez asked appellant if he had been read his constitutional rights when he was arrested the previous day, and appellant replied that he had. Ramirez asked, "You stated to the officers that you wanted an attorney?" Appellant replied, "No, sir." Ramirez asked him if he needed an attorney "right now." Appellant again replied, "No, sir." Ramirez then read appellant his rights as required by Article 38.22 and *Miranda v. Arizona,* 384 U.S. 436 (1966), and also recited the following waiver:

> I have read this statement of my rights (this statement of my rights has been read to
> me) and I understand what my rights are. I am willing to discuss subjects presented
> and answer questions. I do not want a lawyer at this time. I understand and know

---

[16] Defense counsel objected that the tape was inadmissible because it was a copy and stated, "We have not been privy to the original." The prosecutor responded that the defense had been given a copy "of what we have, which is a copy." The court stated, "Assuming that they are going to have the original at the time of the trial, your objection is overruled."

what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

Appellant signed the statutory rights form and a waiver stating that he understood his rights, that he wanted to waive them, and that he wanted to discuss the homicides on Monte Cristo Road. Appellant also answered questions about extraneous matters including the shootings in Donna, another robbery and murder "at a trailer park," and whether or not there was a "hit" on an FBI agent.[17] When Ramirez asked appellant about how he had been treated by police thus far, appellant acknowledged that he had not been treated badly and that he was comfortable with the investigation.

Defense counsel argued at the conclusion of the suppression hearing that appellant's statement was inadmissible because it was involuntary and had been taken in violation of appellant's right to counsel. The trial court denied the motion to suppress.

At trial, Ramirez testified that he was checking the cell blocks on January 24 when appellant said he wanted to talk to Ramirez and that he wanted to cooperate with the investigation. Ramirez told appellant that he could not talk to appellant because he had already told investigators that he wanted an attorney. Ramirez testified that he didn't really think appellant was serious about cooperating, so he told him, "Look, if you want to cooperate without an attorney, tell me where the weapons are." Appellant told him where the weapons were.

The next day, appellant still wanted to cooperate and asked to talk to Ramirez, so he was taken to Ramirez's office. After Ramirez read appellant the statutory warnings, appellant signed a written waiver of his rights and agreed to give a statement. When the state introduced State's Exhibit 306, a compact disk containing the redacted version of appellant's audio-taped statement,

---

[17] The statement that was ultimately admitted into evidence at trial at guilt was redacted to exclude references to the robbery and murder "at a trailer park" and the possibility of a "hit" on an FBI agent.

defense counsel addressed the court.

[DEFENSE COUNSEL]: Your Honor, without waiving any of our previous objections, we would stand mute at this time.

THE COURT: Very well, sir.

[DEFENSE COUNSEL]: And we would incorporate our previous objections.

THE COURT: Having heard the prior objections, those objections are again overruled and the exhibit is admitted into evidence.

State's Exhibit 306 was then played for the jury.

Once a suspect has invoked his Fifth Amendment right to counsel during questioning by law enforcement, all interrogation by the police must cease until counsel is provided or the suspect reinitiates conversation. *Edwards v. Arizona,* 451 U.S. 477, 484-85 (1981). This is a bright-line rule designed to protect a suspect in police custody from being badgered by police officers. *Cross v. State,* 144 S.W.3d 521, 526 (Tex. Crim. App. 2004). A suspect, however, can waive his previously invoked right to counsel if: (1) the suspect himself initiates further communication with the authorities after invoking the right to counsel; and, (2) after he reinitiates communication with the authorities, the suspect validly waives the right to counsel. *Id.* at 526-27, *citing Oregon v. Bradshaw,* 462 U.S. 1039, 1044-46 (1983).

Ramirez acknowledged at trial that he knew appellant had already told investigators that he wanted an attorney. However, appellant twice initiated communication with Ramirez after that point. He first told Ramirez that he wanted to talk to him and that he wanted to cooperate with the investigation when Ramirez was checking the cell blocks on January 24. The next day, he asked to talk to Ramirez again. Before taking his statement, Ramirez read appellant his rights. Appellant said that he did not need an attorney and signed a written waiver. The waiver stated that he understood

his rights, that he did not want a lawyer, and that he had not been subjected to any threats, promises, pressure, or coercion. If appellant had previously invoked his right to counsel, then these facts establish that he waived that right before giving his statement to Ramirez. The trial court did not abuse its discretion in overruling appellant's Fifth Amendment objections.

The state concedes that the record in this case shows that the state did not produce the original recording of Appellant's statement, either at the pre-trial suppression hearing or at trial.

Article 38.22, § 3(b) provides that

> [e]very electronic recording of any statement made by an accused during a custodial interrogation must be preserved until such time as the defendant's conviction for any offense relating thereto is final, all direct appeals therefrom are exhausted, or the prosecution of such offenses is barred by law.

Appellant, however, has not shown that his substantial rights were affected by the admission of the copy. *See* TEX. R. APP. P. 44.2(b). Ramirez testified that the copy of appellant's taped statement offered by the state at the suppression hearing was the same as the original recording that he made. Further, as the state points out in its brief, the original recording would have been introduced only for authentication purposes, because only a redacted copy was admitted into evidence and played before the jury at trial.

Appellant's argues that his statement was not voluntarily given. Appellant has failed on appeal to support this contention with any facts or law. At the conclusion of the suppression hearing, defense counsel argued that there was no evidence to show that appellant had had any sleep for approximately fifty hours. Defense counsel, however, presented no evidence to show that appellant had, in fact, not slept for fifty hours before giving his statement.

Defense counsel also argued at the conclusion of the suppression hearing that both the FBI

and the Texas Rangers had questioned appellant before he talked to Ramirez. However, any conclusions that might be drawn from that argument are refuted by appellant's signed waiver indicating that he had not been subjected to any threats, promises, pressure, or coercion prior to giving his statement.

The trial court did not abuse its discretion by denying appellant's motion to suppress and admitting his statement into evidence at trial. Points of error thirty-one through thirty-three are overruled.

## PUNISHMENT POINTS OF ERROR

### Degree of Culpability

In point of error twenty-nine, appellant contends that the imposition of the death penalty on appellant is inconsistent with the Eighth and Fourteenth Amendments to the United States Constitution. Appellant asserts that the facts in the instant case do not satisfy the *Enmund/Tison* culpability requirement beyond a reasonable doubt. *Enmund v. Florida,* 458 U.S. 782 (1982); *Tison v. Arizona,* 481 U.S. 137 (1987).

In *Enmund,* the United States Supreme Court addressed the question of "whether death is a valid penalty under the Eighth and Fourteenth Amendments for one who neither took life, attempted to take life, nor intended to take life." *Id.* at 787. Although the only evidence of his participation was "the jury's likely inference that he was the person in the car by the side of the road near the scene of the crimes," Enmund was sentenced to death for his role in an armed robbery. *Id.* at 786.

> *Enmund* explicitly dealt with two subsets of all felony murders in assessing whether Enmund's sentence was disproportional under the Eighth Amendment. At one pole was Enmund himself: the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state. Only a small minority of States even authorized the death penalty in such circumstances

and even within those jurisdictions the death penalty was almost never exacted for such a crime. The Court held that capital punishment was disproportional in these cases. *Enmund* also clearly dealt with the other polar case: the felony murderer who actually killed, attempted to kill, or intended to kill. The Court clearly held that the equally small minority of jurisdictions that limited the death penalty to these circumstances could continue to exact it in accordance with the local law when the circumstances warranted.

*Tison,* 481 U.S. at 149-150.

The defendants in *Tison,* two brothers who had helped their father escape from prison, fell outside the categories addressed in *Enmund.* 481 U.S. at 151.

Raymond Tison brought an arsenal of lethal weapons into the Arizona State Prison which he then handed over to two convicted murderers, one of whom he knew had killed a prison guard in the course of a previous escape attempt. By his own admission he was prepared to kill in furtherance of the prison break. He performed the crucial role of flagging down a passing car occupied by an innocent family whose fate was then entrusted to the known killers he had previously armed. He robbed these people at their direction and then guarded the victims at gunpoint while they considered what next to do. He stood by and watched the killing, making no effort to assist the victims before, during, or after the shooting. Instead, he chose to assist the killers in their continuing criminal endeavors, ending in a gun battle with the police in the final showdown.

Ricky Tison's behavior differs in slight details only. Like Raymond, he intentionally brought the guns into the prison to arm the murderers. He could have foreseen that lethal force might be used, particularly since he knew that his father's previous escape attempt had resulted in murder. He, too, participated fully in the kidnaping and robbery and watched the killing after which he chose to aid those whom he had placed in the position to kill rather than their victims.

*Id.* at 151-152. The Court held in *Tison* that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund* culpability requirement."

*Id.* at 158.

Appellant's statement set out his version of the events in this case. He provided the weapons that were to be used in an armed robbery, but did not participate in the robbery directly. Although

some of his weapons had been used to commit the Donna killings that had occurred four months before this offense, they were used in that crime without his prior knowledge that a murder was intended, because "Roach did not follow the chain of command and no one knew that killings were going to be carried out." With regard to this case, it was appellant's understanding that the co-conspirators were just going to steal some marijuana and that nobody was supposed to have been killed. The other co-conspirators were not at Juanon's house when appellant followed Gallo's order to deliver the guns there. Appellant elected not to accompany the co-conspirators during the commission of the planned armed robbery, and he was unaware that anyone had been killed until the following day. He was later told that the co-conspirators decided to kill the victims when they discovered letters at the scene indicating that the victims of the robbery were members of a rival gang. He retrieved his guns after the crime had been committed, but he left them with Tinajero after the police arrested Marcial Bocanegra and "everything came out in the news."

The evidence in this case is closer to the major participants in *Tison* than the minor actor in *Enmund.* Appellant was an officer in, and armorer of, a gang that engaged in illegal activities. Just four months before the murders in this case, appellant had supplied weapons to another gang member, apparently without questioning the use to which those weapons might be put. He knew, at the time that he received a request for weapons for the robbery that was planned in this case, that his weapons had been used to kill four women in Donna, and that some of the other gang members had been involved in at least one other murder. When he provided the weapons, as requested, he knew that there was to be a robbery and that his weapons were to be used in the robbery.[18]

---

[18] The provisions of § 7.02(b) of the Penal Code allow conviction for capital murder using a standard of "should have anticipated" that a capital murder would result.

Article 37.071 (2)(b)(2) of the Penal Code provides that

> in cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

Given his knowledge of his fellow gang members' demonstrated willingness to kill, a rational jury could find, beyond a reasonable doubt, that appellant did anticipate, when he supplied semi-automatic weapons to Gallo, that the victims of the robbery might well be killed during the robbery. Appellant's actions bring him under the provisions of Art. 37.071 (2)(b)(2). Point of error twenty-nine is overruled.

**Constitutional Claims**

Appellant raises two other points of error pertaining to the punishment phase. In point of error twenty-seven, he asserts that the sentencing scheme contemplated in Article 37.071, § 2(a)(2)(b)(2) of the Texas Code of Criminal Procedure is unconstitutional because it allows the jury to consider the law of parties in answering special issue number two at punishment. "Reading the statute literally, the plain language of special issue number two allows the jury to hold a 'non-triggerman' vicariously responsible for the conduct of the actual shooter(s) in answering this special issue affirmatively." Appellant's brief at 101. The plain language of the statute allows precisely

---

If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance on the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

The provisions of art. 37.071 of the Code of Criminal Procedure specify when a person who has been convicted of capital murder pursuant to § 7.02(b) may be sentenced to death.

that. Coupled with the plain language of § 7.02 (b),[19] any person who enters into a conspiracy by planning, executing, or aiding and abetting others in planning or executing the offense contemplated by the conspiracy is guilty of any felony, whether the intended felony or another, actually committed by a member of the conspiracy "in furtherance of the unlawful purpose." The question left to the jury as finder of fact is whether the defendant actually anticipated that a human life would be taken. We have decided this issue adversely to appellant, holding that the anti-parties special issue is constitutional "because it specifically instructs the jury to consider the defendant's behavior alone." *Wood v. State*, 18 S.W.3d 642, 649 (Tex. Crim. App. 2000)(citing *McFarland v. State*, 928 S.W.2d 482, 516-17 (Tex. Crim. App. 1996)(quoting Article 37.071, § 2(b)(2), "the defendant himself"). Appellant does not persuade us to revisit this issue. Point of error twenty-seven is overruled.

In point of error twenty-eight, appellant argues that the evidence was insufficient to prove that appellant actually anticipated that a human life would be taken, as contemplated by special issue number two. Appellant knew of, at the very least, the multiple murders in Donna and an unrelated murder "in a trailer park," all committed by members of his gang. He knew that his weapons had been used in the Donna killings and that an armed robbery using his semi-automatic rifles was planned. In these circumstances, there is at least minimally sufficient evidence to prove that appellant actually anticipated that one or more human lives would be taken. Point of error twenty-eight is overruled.

Finally, in point of error thirty-four, appellant argues that this case should be reversed because of cumulative error. We have rejected each of appellant's points of error. Without error, there is no cumulative effect. *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999);

---

[19] "A defendant may be convicted of capital murder under § 7.02(b) without having the intent or actual anticipation that a human life would be taken that is required for an affirmative answer to the anti-parties issue." *Valle v. State,* 109 S.W.3d 500, 503-04 (Tex. Crim. App. 2003).

*Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000).  Point of error thirty-four is overruled.

       We affirm the judgment of the trial court.

Delivered: November 26, 2008
Do Not Publish